KARBACH REALTY COMPANY, APPELLANT, V. GEORGE & COMPANY, APPELLEE.

FILED SEPTEMBER 26, 1914.   No. 17,746.

1. **Appeal in Equity.** While the supreme court is not bound by the find-ings and judgment of the trial court in an equity case, yet if the conclusion of the district court is derived in whole or in part from the consideration of the testimony of witnesses taken in the presence of the court, and such testimony is clearly in conflict, then the findings of the trial court may be considered in determining the issues in this court, the judges of this court keeping in mind that they are not bound to follow them. *Cooley v. Rafter,* 80 Neb. 181; *Nelson v. City of Florence,* 94 Neb. 847.

2. **Annulment of Lease:** SUFFICIENCY OF EVIDENCE. The pleadings and evidence examined, and *held* to sustain the finding and judgment of the district court.

APPEAL from the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. *Affirmed.*

*C. W. De Lamatre* and *Byron G. Burbank,* for appellant.

*McGilton, Gaines & Smith, contra.*

HAMER, J.

This is an appeal from a decree of the district court for Douglas county. The purpose of the suit is to set aside a lease of the Karbach Hotel property in the city of Omaha to one Mahlon B. Brown for the period of 99 years.

It is claimed by the plaintiff company that the defendant, George & Company, undertook to act as the agent of the Karbach Hotel Company in getting the lease in controversy; that the plaintiff company was induced to execute this lease by the fraudulent representations of the defendant, George & Company; and that George & Company procured the execution of the lease to Brown for its own benefit, and that it holds the property and collects the rents on its own account. The representations alleged to

be fraudulent are that the said defendant, Mahlon B. Brown, was represented by George & Company to be a retired capitalist and a good substantial business man, and it was further represented that the highest amount that could be obtained for said leasehold was the sum of $5,400 a year, and that the same was not worth more than $5,400 per year. It is claimed by the plaintiff that these representations by the defendant, George & Company were false; that George & Company knew that the representations were false; and that they were made with the intention of influencing the plaintiff to act upon them; and that the plaintiff believed the same to be true, and, relying upon them, on or about the 27th day of July executed in writing a paper in the form of a lease, which had been prepared by the defendant, George & Company, and whereby the plaintiff purported to lease to the defendant, Mahlon B. Brown, the premises in controversy for the period of 99 years, beginning on the 1st day of August, 1911, and for the sum of $5,400 each year, beginning on the 1st day of August.

In the action brought the defendant, Mahlon B. Brown, was defaulted, and a decree was taken against him, canceling his interest in the lease, and holding that he had no interest therein. The defendant, George & Company, against which the plaintiff had prayed an accounting of the rents collected, and for the commission which it had paid for leasing the said premises, answered, denying all allegations of fraud, and pleaded an option contract for the leasing of the premises to it, alleging that it later exercised its option to lease the premises, and that at the time of executing the lease it stated, by its president, to the plaintiff, through its vice president and general manager, that it desired the lease taken in the name of the said defendant, Mahlon B. Brown.

An examination of the testimony shows that Charles J. Karbach, who seems to have managed the affairs of the company, had lived in Omaha about 42 years; that he was vice president and a member of the board of directors of the plaintiff company and general manager of the plain-

tiff. He testified that the property in controversy was lot 8, in block 147, located at Fifteenth and Howard streets, in Omaha, the building described as a three-story brick building, 60 by 132 feet, and having six store rooms, five of which are occupied by merchants and one as the office of the Karbach Hotel, which hotel also occupies the upper floors of the building. He also testified that the property had been in the family about 50 years. His testimony shows that he had visited C. C. George of the defendant George & Company, and that' there had been a discussion between Mr. George and himself touching the rate of interest that a lease of this kind would bring. They seem to have discussed the advantage of a lease because it saved the landlord the trouble of collections and the payment of taxes, and resulted in an income of about 5 per cent. on the value of the property. It seems that Mr. George made a proposition to him looking to the payment of 5½ per cent. on a valuation of $100,000. Karbach testified that he told George to go ahead, and that he asked George what his commission would be to make the arrangement, and that George told him it would be 2½ per cent.; that he said, "All right, go ahead." Then George said he would draw up the option and submit it to Karbach. Karbach testified that he said "All right," and that he agreed to pay a commission of $2,500 for getting the lease.

The trial court dismissed the plaintiff's petition as against George & Company, and confirmed the title of George & Company to the lease as a lessee.

The proof shows the option contract referred to to be in writing and signed by the Karbach Realty Company and George & Company, and it recites the terms and condition under which the Karbach Realty Company grants to George & Company, its successors and assigns, and that George & Company asks the privilege of leasing the premises in controversy. The lease when executed was signed by Mahlon B. Brown as lessee.

June 26, 1911, the Karbach Realty Company and the defendant, George & Company, made a contract in writing by which it was stipulated that George & Company,

"its successors and assigns," should have the privilege until the 26th day of December, 1911, of leasing the property in controversy. This contract provides that George & Company, as lessee, is to pay the Karbach Realty Company, its successors and assigns, $5,500 a year, payable quarterly in advance in sums of $1,375 each quarter. In addition thereto, George & Company, "its successors and assigns," shall pay all regular and special taxes of every kind that may be assessed or levied against said property from and after the date of final closing of this lease. Then comes a provision that George & Company, or its assigns, shall keep the building on said lot insured, or any building that may be hereafter erected thereon, and for the benefit of the Karbach Company, the amount of the insurance to be $40,000, payable to the party of the first part, as its leasehold interest may appear, with the understanding that, in the event of loss by fire, the money paid by the insurance company to the lessor or the lessee on account of said loss shall be used to repair or reconstruct the building. Then comes a provision that the 99-year lease to be used shall be in form substantially "the same as the lease made by Adelina M. Jahn covering lot 3, block 171, city of Omaha, and dated December 1, 1909." The condition of the particular contract is then set out. The transaction began with the execution of the contract of June 26, 1911. That contract *is based upon the promise of the parties* and the payment of one dollar by George & Company to the Karbach Company. The language used is, "For and in consideration of these presents." To this is added the payment of *one dollar*, the receipt of the same by the Karbach Company, followed by the promise of the Karbach Company to "grant and give" to George & Company, "its successors and assigns, the privilege" from a certain date to a certain date "of leasing the following described real estate," being lot 8, in block 147 of the city of Omaha, "together with the three-story and basement brick building thereon." The next sentence begins with the words "said lease," seeming to refer to the lease made by the Karbach Company to George & Company. Said

lease, referring to the privilege mentioned and fixing the time from June 26, 1911, to December 26, 1911, was an option upon the part of George & Company. The next provision in the contract is that the party of the first part, George & Company, "its successors and assigns," is to pay "a rental for said property of $5,500 a year, payable quarterly in advance in sums of $1,375 each quarter." The foregoing promise to pay $5,500 a year is a promise on the part of George & Company, in case George & Company avails itself of the option. The next provision in the contract is that George & Company shall "pay all regular and special taxes that may be assessed or levied against said property from and after the date of final closing of this lease." The contract further provides that, if the option is not taken up and the lease made on or before September 26, 1911, then on September 26, 1911, $100 is to be paid thereon. It is further provided that, if the option is not taken on or before October 26, 1911, then $100 more is to be paid on the option, and, if the option is not taken by George & Company on or before November 26, 1911, then $100 is to be paid on November 26, 1911, to carry the option through to December 26, 1911. All sums paid are to be applied on the first quarterly payment in the event that the option is exercised later. There is a further provision that, in case George & Company avails itself of the option at any date on or before December 26, 1911, then Karbach Company is to allow George & Company $2,500 "for placing this leasehold."

There is a concluding clause to the effect that, if the 99-year lease is made and the papers executed and delivered, then the possession of the property is to be given to the lessee, subject to the leases on the building above referred to.

The foregoing analysis of this contract would seem to show that George & Company bargained for this option upon its own account and for itself alone. It did not purport to act as the agent of the Karbach Company in getting this option. It was not getting the option for any one else, but just for itself alone. Therefore, as to the option,

there was no question of principal and agent. The Karbach Company acted for itself and George & Company acted for itself. There were two principals dealing with each other. George & Company was contemplated by this contract as lessee if it chose to exercise the option in that way. As the above contract ran directly to George & Company, there could be no objection to George & Company availing itself of this contract. It was entitled to exercise it for itself alone.

There cannot well be any doubt that George & Company was to be permitted, under this first contract, to become lessee of the premises. There could be no objection to putting Brown's name in the lease, unless Karbach made it. He made no such objection, but consented to it.

It will be noticed that this contract allows George & Company to lease the property itself. It also allows it to get a lessee for the property. Is it fair to say that it was within the contemplation of the manager of the Karbach Company that George & Company should become lessee at its option or that it could get any other lessee? It is contended by the appellee that, when this agreement was made, the agreement was that Karbach would lease the property to George & Company, that "Karbach accordingly knew that George & Company was exercising the option for itself." It is said with much plausibility that "Karbach may have had the right to insist that the lease should run to George & Company, but this he could waive and consent that the title be put in Brown." He seems to have consented that Brown's name should be put into the lease. The lease was prepared in blank. At that time George stated to Karbach that they had not determined in whose name they would place the title.

Mr. Karbach testified that he had a conversation with George about July 20, before the lease was made. He testified that the lease was signed in Mr. George's office; that Mr. George had asked him to come over to sign it; that Mr. George said that Mr. Brown would be over there ready. He then says that he went over to George's office, and that Mr. E. George said to him to step into the side

office where there was a window open to the outside, and
that it would be pleasanter; that he went to the room, and
was there about five minutes; the door to C. C. George's
room opened, and he said, "We are ready for you now
Charles, the lease is ready for you to sign. I will call in one
of the clerks of the office to witness your signature." C. C.
George went out for a clerk. Karbach looked at the lease.
The lease was signed by Mahlon B. Brown. Karbach in-
quired where is Mr. Brown. C. C. George answered that
Mr. Brown did not have very much time; that he had been
called back again; and that he had signed the lease, and
then had gone away. Karbach then signed the lease him-
self. He knew that Brown had signed it. He was willing
to accept it with Brown's signature. He testified that no
once was present at the conversation but C. C. George
and himself. Karbach testified that he had no knowledge
that Brown was acting for George & Company. He testi-
fied that afterwards in January, 1912, he had a conversa-
tion with Mr. Adams, and that his conversation with Mr.
Adams suggested whether there was good faith in the lease
to Brown. If that inquiry was material, it was late to
make it six months after the contract had been closed
up. Karbach testified that C. C. George came to his office
with two papers which he wanted him to sign consenting
to Brown assigning the lease to Kittelman, Scher & Wolf.
When Karbach complained, C. C. George told him that
Kittelman was worth $80,000 to $90,000, and that the other
men were pretty well fixed. On cross-examination Kar-
bach testified that he was in the office of George & Com-
pany three or four times before they finally came to an
agreement about leasing the property. Karbach testified
that the lease was drawn up and submitted to him by Mr.
George, and that he took the lease to his attorney, Mr. De
Lamatre, and then took it back to Mr. George and gave
it to him.

It is said in the answer of George & Company: "That
at the time (of signing the lease) this defendant, by its
president, Charles C. George, stated to plaintiff, to its
manager, Charles J. Karbach, that it desired said lease to

be taken in the name of Mahlon B. Brown, and that no objections were taken to said Brown by the plaintiff, and that no inquiries were asked defendant concerning him, except only as to the place of his residence, and accordingly on said date, the 27th of July, 1911, a lease was entered into between said parties, a copy of which is hereto attached marked exhibit B and made a part hereof." The evidence seems to support this conclusion.

There is a very severe arraignment of George & Company in the brief of counsel for the plaintiff. It is said that Mahlon B. Brown is a poor man working in the engineering department of the city of Council Bluffs, and that at the time he was brought into the case he was an inspector of pavements; that he had no property, and required his salary for his daily living. It does not follow that any fraud was contemplated because of the fact that an unknown man was selected to be the lessee of the property. There might have been valid business reasons containing no purpose to defraud which induced George & Company to seek out an unknown man for the purpose of becoming lessee of the property. If George & Company had for itself inserted its name in the contract, or the name or names of some successful business man in the neighborhood, it might have agitated the market for real estate in that vicinity.

It is contended that, because the name of George & Company did not appear in the lease, therefore it could not be held to be lessee, or the holder of the property as lessee. It is proper to remember that the inception of the contract was a carefully prepared agreement in writing, in which the purpose is set forth to be the privilege of leasing the property in controversy. Karbach testified that George told him at the inception of the transaction that Brown was leasing the property. George testified that he told Karbach that he did not know in whose name we would take title to that leasehold. There seems to be no controversy about the fact that George told Karbach that George & Company was ready to exercise the option. When the lease was prepared, Karbach submitted it to his attor-

ney.  The attorney wrote a brief statement to the effect
that the agreement made between Karbach and George &
Company on the date of June 26, 1911, providing for the
leasing of lot 8, in block 147, for the period of 99 years
had been received by him, and also the lease had been pre-
pared under the agreement.  In that statement, which was
to his client Karbach, he said that he presumed that it was
with the intention *on their part to carry out the agree-
ment.*

It is contended by counsel for the defendant that Kar-
bach understood that George & Company was exercising
its option to take the property in accordance with the
contract of June 26.  This does not necessarily follow, but
under the evidence, including Karbach's testimony, it may
have been considered by Karbach that it made no differ-
ence who signed the lease.  At any rate, Karbach made no
objection to the signing of the lease by Brown.  George
testified that he told Karbach, at the time that he sub-
mitted to him the form in which the lease was to be writ-
ten, that he did not know in whose name they would take
title to the property.  The parties may have considered
that was a sort of secondary matter and probably imma-
terial.  Whether it was so or not, Brown's name was writ-
ten into the lease, and Brown signed it, and Karbach knew
when he received the lease that Brown had done so.  The
district court had an opportunity to consider the ques-
tion whether Karbach knew that George & Company was
taking the leasehold for itself, and whether Brown was a
mere convenience to whom the property was to be tempora-
rily conveyed.  It is doing no violence to the intention of
the parties to say that both contracts entered into the pur-
pose of the parties, and that both contracts together con-
stitute the whole.

On January 25, 1912, Jacob Kittelman and others made
an offer to George & Company to purchase the lease in
question.  An assignment of the lease was submitted to
Mr. Karbach about January 28.  At that time Karbach
asked George who these people were, and was told
by George that they were all right, and that Kittelman

alone was worth a good many thousand dollars.     At this time Karbach complained and seems to have been dissatisfied.     Whether it was because there was an opportunity to sell the lease for a profit of $25,000, or thereabouts, it is not necessary to determine.     Up to that time Karbach had not complained of Brown.     Shortly after that he went to Council Bluffs, and soon thereafter brought the suit.     The question unavoidably presents itself as to whether Karbach's dissatisfaction was due to the fact that George & Company had an opportunity to realize a profit.     The circumstances, taken together, would seem to indicate that Karbach was the manager for the plaintiff company, and understood from the beginning that George & Company was to exercise its option concerning a lease to the property.     The instrument itself specifically provides that the option was to run to George & Company; also, that George & Company had the right to exercise this option.     When George told Karbach that they would take the option, Karbach must have understood that George & Company was taking the property by lease thereto, or at least that George & Company was in control of the property.

The provision of the contract that the lessee might take possession of the premises contemplated that George & Company might go into possession.     If Brown made no objection and Karbach made no objection, then George & Company was rightfully in possession under the lease which might have been executed to it, but was not because the parties interested consented that Brown should be named as lessee.     George & Company undertook to procure for the plaintiff a paying tenant or lessee, which might be itself at its option, or any one else it saw fit to name who would pay the annual rent and comply with the other terms of the lease.     It is not now claimed that the rent has not been paid or that there has been any breach of the terms of the lease, unless it was a breach to put Brown's name in the lease as lessee, and Karbach testified that he permitted that to be done.     Everybody seems to have agreed to what was done, and the plaintiff has been

96 Neb. 52

receiving the rent from George & Company, who paid it, and who seems to. be the responsible party in the case. There is no complaint that George & Company is not solvent or is not willing to carry on the contract.

Brown defaulted and made no defense. The decree of the district court finds that "Brown never did have and has not now any real or substantial interest in or to the certain leasehold in question herein, and that whatever apparent interest, if any, the said Brown may have had or may now have in or to said leasehold, the same should be canceled and held for naught." The district court further finds for the defendant George & Company and against the plaintiff herein, and finds that the amended petition of said plaintiff should be dismissed for want of equity, and further finds "that the defendant, George & Company at all times has been, and is now, the sole owner of and the only real party in interest in or to said leasehold as lessee thereof." The judgment is: "It is therefore ordered, adjudged and decreed by the court that whatever interest, or apparent interest, the said defendant Brown may have, or claim to have, in or to said leasehold, the same be and hereby is canceled and held for naught. It is further ordered, adjudged and decreed by the court that the amended petition of the plaintiff herein be, and the same hereby is, dismissed for want of equity, and that the said leasehold herein referred to be, and the same hereby is, settled and confirmed in the defendant, George & Company, as lessee thereof."

Under the finding and judgment of the district court, the effect is substantially the same as if George & Company had signed the lease itself as lessee, and should then be brought into court to answer to some sort of dereliction of duty without the same being alleged or proved. Karbach testified that George told him at the commencement of the transaction that Brown was to be the lessee, and that he was a man of property. George denied this. The lease, being a blank as to the lessee's name when the same was first prepared, furnishes some evidence tending to cor-

roborate George and to sustain the finding and judgment of the district court.

We admire the arguments made by counsel for the plaintiff, but we are not convinced by them. There is a sharp conflict of evidence, and the district court has determined that conflict in favor of the defendant. There is evidence to sustain its findings, and we do not feel justified in declaring that its judgment is wrong.

The judgment of the district court is

AFFIRMED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.